IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 46253

STATE OF IDAHO,　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　Plaintiff-Respondent,　　　　　　　）　　Boise, December 2019 Term
　　　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　　　）　　Opinion Filed: April 28, 2020
　　　　　　　　　　　　　　　　　　　）
JESUS MANUEL GARCIA,　　　　　　　　）　　Karel A. Lehrman, Clerk
　　　　　　　　　　　　　　　　　　　）
　　Defendant-Appellant.　　　　　　　　）

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Michael J. Reardon, District Judge.

The judgment of conviction of the district court is <u>affirmed</u>. The order of restitution is <u>vacated</u> and <u>remanded</u>.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant Jesus Manuel Garcia. Elizabeth A. Allred argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent State of Idaho. Jeffery D. Nye argued.

_____

STEGNER, Justice.

After a jury trial in Ada County district court, Jesus Manuel Garcia was found guilty of second-degree murder, aggravated battery, use of a deadly weapon during the commission of the former crimes, and possession of a controlled substance. The district court sentenced Garcia to an indeterminate life sentence with twenty-five years fixed for second degree murder, which included a sentencing enhancement for the use of a deadly weapon. The district court also sentenced Garcia to twenty years, with six years fixed, for aggravated battery; this also included a sentencing enhancement for the use of a deadly weapon. The district court further sentenced Garcia to three years fixed for the possession of a controlled substance conviction. All three sentences were ordered to run concurrently. Finally, the district court ordered restitution to the victims in the amount of $162,285.27.

Garcia timely appealed, arguing that (1) the district court abused its discretion in allowing the State to present "in-life" photos of the victim and to elicit testimony about the victim's

1

personality and character during trial; (2) the prosecutor committed misconduct when she referred to this challenged evidence in her closing statement; (3) Garcia was deprived of due process because of the cumulative errors; (4) the district court abused its discretion in imposing a sentence that did not give proper weight and consideration to mitigating factors; and (5) the district court abused its discretion in ordering Garcia to pay restitution without adequately considering his current and future ability to pay restitution. For the reasons set forth below, we affirm Garcia's judgment of conviction as well as the sentence imposed. We vacate the order of restitution and remand the case for further proceedings.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On Friday, January 13, 2017, Garcia and a group of friends went out for dinner and then to several bars in downtown Boise. Garcia consumed alcohol and ingested methamphetamine throughout the night. He was also observed carrying a knife. During the evening, Garcia was described by witnesses as aggressive and agitated.

Garcia's group ended up at China Blue, a club in downtown Boise. Once inside, one of Garcia's acquaintances, Eric Hernandez, went to the restroom, and testified that he was "shoulder checked" by a man either in the hallway to the men's restroom or at the entrance of the restroom. When Hernandez returned to the group, he told his girlfriend and Garcia about the incident. Garcia then went to the bathroom with Hernandez in tow. On the way, Garcia struck or "elbow checked" a man. Garcia and Hernandez then went into the men's restroom.

According to trial testimony, while Garcia and Hernandez were in the China Blue men's restroom, some kind of confrontation occurred between Garcia and a man by the name of Luis Rosales. Rosales testified at trial that Garcia had given him some kind of "mad look." Rosales exited the bathroom and went to the bar to meet several of his acquaintances, including brothers Misael Ruiz Gomez (Misael) and Daviel Ruiz Gomez (Daviel). When Garcia and Hernandez left the bathroom,[1] Rosales, Misael, and Daviel approached the two men on the dance floor. A scuffle broke out and Rosales threw the first punch. Within a matter of seconds, Garcia stabbed Daviel in the chest and in the abdomen, and stabbed Rosales eight times total in the abdomen, stomach, side, and elbow. Garcia then attempted to flee the club, but he was tackled on the front steps by bouncers.

---

[1] As Garcia and Hernandez exited the bathroom, the hallway security video appears to show that Garcia had his knife out.

2

Daviel collapsed on the edge of the dance floor, and never regained consciousness. Daviel died at the hospital three days later. Rosales, unaware that he had been stabbed, tried to leave the club but collapsed on the club's front steps; he later recovered from his wounds. The knife used in the stabbings was found where Garcia had been seen throwing it away as he fled. After Garcia was detained, police found a small plastic bag of what would later be identified as methamphetamine in his pocket. Garcia was taken into custody and interviewed at the Boise Police Department. He was arrested and charged with possession of methamphetamine. After Daviel died, Garcia was charged with second degree murder for Daviel's death, and with the aggravated battery of Rosales.

The case was ultimately set for trial in April 2018. Before trial, the State notified Garcia's attorney that it wanted to introduce several "in-life" photographs of Daviel. Garcia's attorney objected, arguing that the photographs were irrelevant and that, even if the photos were relevant, their introduction would be more unfairly prejudicial than probative. The district court overruled Garcia's objection, stating that the photos were "reasonable photographs and the State's entitled to show that the victim was a human being, which is an element that's been charged . . . . I think those two photographs won't create any undue prejudice."

On April 9, 2018, the State called Daviel's wife, Danielle Nylander, to testify. When asked to describe Daviel, Nylander testified about how wonderful her husband was. When the defense objected to this testimony as irrelevant and overly prejudicial, the objections were overruled. The State also offered the challenged photographs into evidence. Garcia's attorney renewed the objection but it was overruled.

Throughout trial, Garcia admitted that he had in fact stabbed Rosales and Daviel in the nightclub, but claimed self-defense.[2] Accordingly, the only issues for the jury to decide were whether Garcia had acted with malice, and whether Garcia had acted reasonably in self-defense.

On April 19, 2018, the final day of trial, the State began its closing statement by describing Daviel as "21 years old that, [sic] he had a loving family, that he grew up in Nampa,

---

[2] Rosales testified that he, Daviel, and Misael approached Garcia and Hernandez on the dance floor "[j]ust to see if – what was going on . . . . [b]ecause I felt like when he was walking around, I felt like there was tension there and I wanted to see what was the deal, you know." The security video confirms that the three confronted Garcia and Hernandez. There is also conflicting testimony about what occurred in the bathroom prior to the confrontation on the dance floor. Nevertheless, Garcia left the men's bathroom holding the knife in his hand immediately before the confrontation on the dance floor. Further, of the three who confronted Garcia and Hernandez on the dance floor, Daviel was the last to arrive, and does not appear to have thrown any punches, instead appearing to hold or grab either Garcia or Hernandez.

that he had a father, Jose, his mother . . . ." Garcia's attorney objected to this as going to the passions of the jury. The objection was overruled. Thereafter, the State briefly referenced Nylander's testimony, and referred to the two photographs once. The defense did not again object to this argument. The case was submitted to the jury after the closing arguments and instructions, and the jury returned a verdict of guilty for the charges of second-degree murder, aggravated battery, and possession of a controlled substance. The jury also found that the murder and battery had been committed with the use of a deadly weapon, which meant sentencing enhancements applied to those charges.

On July 19, 2018, the district court sentenced Garcia to unified sentences of indeterminate life, with twenty-five years fixed, for second-degree murder and the use of a deadly weapon enhancement; indeterminate twenty years, with six years fixed, for the aggravated battery conviction and the use of a deadly weapon enhancement; and three years fixed, for the possession of a controlled substance conviction. All of the sentences imposed were to be served concurrently.

After trial, the State requested restitution in the amount of $165,715.27. Garcia objected, arguing that certain costs were not permitted under the restitution statute and that Garcia had no ability to pay the remaining restitution amounts. The district court entered an order awarding restitution in the amount of $162,285.27 on December 17, 2018. Garcia timely appealed.

## II.     STANDARD OF REVIEW

The standards of review for the various issues will be set out in the analysis of each issue.

## III.     ANALYSIS

A. **The district court did not abuse its discretion in admitting the in-life photographs, but abused its discretion in admitting certain testimony by Nylander about the victim. However, the error was harmless.**

"When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *State v. Smalley*, 164 Idaho 780, 783, 435 P.3d 1100, 1103 (2019) (citation omitted). In determining whether a trial court has abused its discretion, this Court asks whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Bodenbach*, 165 Idaho 577, 591, 448 P.3d 1005, 1019 (2019) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)). "The question of whether evidence is

relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Shutz*, 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006) (citation omitted).

Before trial, the State provided notice of its intent to introduce certain photographs of Daviel. One photograph was from Daviel's wedding day, and showed Daviel outside in a park wearing a suit. The other photograph showed Daviel and his wife together at a local charity run. Garcia's attorney objected on the basis of relevance and unfair prejudice. Nevertheless, this objection was overruled. Garcia's attorney renewed his objection on the basis of relevance at trial. The objection was again overruled. The district court reasoned that the photographs were "reasonable . . . and the State[ is] entitled to show that the victim was a human being, which is an element that's been charged."

Garcia's attorney also objected at trial to certain testimony about the victim elicited from Nylander. Garcia's attorney first objected, asking to approach the bench after Nylander testified that Daviel "was the most amazing person you'll ever meet in your life." Defense counsel renewed this objection when Nylander described Daviel as "very kind," "always willing to help people at all times," and "very, very hard working," and that "[h]e took care of [Nylander] like no one ever did." The State asked Nylander if she and Daviel were planning to have children, and when Nylander answered that they "were trying," Garcia's attorney again renewed his objection on the basis of relevance. Garcia's attorney again objected on the basis of relevance when the State asked Nylander about things she and Daviel enjoyed doing together. Defense counsel's objections were each overruled.

After Nylander's testimony was completed, defense counsel moved in limine under I.R.E. 401 and 403 concerning anticipated testimony that addressed what kind of person the victim was, "rather than what happened that night." The district court denied defense counsel's motion, reasoning that

> the State is entitled to admit a certain amount of evidence that demonstrates that the victim in this case was a human being and it's an element of the proof. And other than simply acknowledging that is true organically, I think that they're entitled to demonstrate some evidence of his humanness.

On appeal, Garcia argues that the two photographs and the challenged portions of Nylander's testimony should not have been admitted because they were not relevant. Garcia argues that the district court's reasoning—that the photographs and testimony were relevant to

5

prove that Daviel was a human being—was erroneous because the district court misperceived this element of proof. Garcia also argues that even if this challenged evidence was relevant, the evidence was more unfairly prejudicial than probative because it allowed the State to portray the victim "in a particularly favorable light and created [an] emotional appeal to the jury." Garcia contends that the photographs in particular portrayed Daviel as a man valued by society because he was young, handsome, happy with his wife, and charitable. Garcia argues that because he was asserting self-defense, this evidence bolstered the victim and that Garcia did not enjoy a similar opportunity.

The State argues that the photographs were relevant both to the victim's identity and to establish the "human" element of proof for murder. The State also contends that the majority of Nylander's challenged testimony was relevant to the victim's (1) background, (2) trait for peacefulness, and (3) physical abilities. The State further argues that Garcia only objected to this testimony based on relevance, not unfair prejudice, because defense counsel's objection *after* Nylander's testimony concluded concerned only the State's *future* witnesses and not prior testimony.

Garcia counters that Nylander's testimony was not relevant to the victim's background or his trait for peacefulness. Garcia further contends that his objection to Nylander's testimony was based on both relevancy *and* prejudice and is therefore preserved.

1. The district court did not abuse its discretion in admitting the in-life photographs of Daviel.

Evidence must be relevant to be admissible at trial. I.R.E. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence[,] and (b) the fact is of consequence in determining the action." I.R.E. 401. "Relevant evidence is admissible unless [the Idaho Rules of Evidence], or other rules applicable in the courts of this state, provide otherwise." I.R.E. 402. "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *State v. Shackelford*, 150 Idaho 355, 364, 247 P.3d 582, 591 (2010) (citing *State v. Yakovac*, 145 Idaho 437, 444, 180 P.3d 476, 483 (2008)). Even relevant evidence may be excluded by the district court if "its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" I.R.E. 403. "In other words, evidence should be excluded if it invites inordinate appeal to lines of reasoning outside of the evidence or emotions which are irrelevant to the decision making process." *State v. Rhoades*, 119 Idaho 594, 604, 809 P.2d 455, 465 (1991).

6

Photographs of a homicide victim at or after time of death may be admissible "as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the corpus delicti, the extent of injury, the condition of the body, and for their bearing on the question of the degree and atrociousness of the crime." *State v. Winn*, 121 Idaho 850, 853, 828 P.2d 879, 882 (1992) (citations omitted). Idaho Code section 18-4001 defines murder as "the unlawful killing of a human being[.]" Accordingly, the State bears the burden of proving that a murder victim was, in fact, a human being. Further, there is no requirement that evidence be relevant only to a disputed issue under I.R.E. 401, only that evidence be probative and material.[3]

The district court did not err in ruling that the photographs were relevant to establishing that Daviel was a human being. Although this element was not in dispute, the photographs portraying Daviel were relevant, however minimally, to establishing this element. Further, the photographs were also relevant for other purposes, as argued by the State below. The State below asserted that the photographs were relevant to establishing the victim's identity. Further, at trial, the State established that the victim wore glasses on the night in question, an example of which was shown in the photograph of Daviel and his wife. Accordingly, the photographs were also relevant because they would be helpful to the jury in identifying the victim on the security video from China Blue, and in establishing the victim's height and appearance such that Garcia's claim of self-defense was made less reasonable.[4] As a result, the district court did not err in finding the photographs relevant.

Even so, relevant evidence will be inadmissible "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

---

[3] The *Idaho Trial Handbook* observes that Idaho Rule of Evidence 401 "requires only minimal relevance, treating evidence as relevant if it has any tendency to make facts more or less probable." D. Craig Lewis, *Idaho Trial Handbook* § 13:1 (2d ed. 2005). In *Shackelford*, 150 Idaho at 364, 247 P.3d at 591, we observed in the context of a Rule 401 analysis that "[e]vidence that is 'relevant to a material and disputed issue concerning the crime charged' is generally admissible." (quoting *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008)). However, the *Stevens* case cited in turn to *State v. Field*, 144 Idaho 559, 569, 165 P.3d 273, 283 (2007), which recited the test for admissibility of misconduct evidence under Rule 404(b). Accordingly, the "disputed issue" requirement appropriate in a Rule 404(b) analysis appears to have been mistakenly grafted into Rule 401 relevance analysis by this Court in the last decade. *Accord State v. Sanchez*, 147 Idaho 521, 526, 211 P.3d 130, 135 (Ct. App. 2009) (observing that the definition of relevance "does not pertain to only disputed facts"). We clarify that there is no "disputed issue" requirement under Rule 401.

[4] During an early interview with police, Garcia stated that when Misael, Daviel, and Rosales approached him and Hernandez on the China Blue dance floor, they looked "like 'pretty fucking hard guys.'" At trial, Garcia admitted to making this statement, and testified that the three men "came at us. They came at us hard, strong and fast[.]" Accordingly, Garcia put in question the appearance and imposing nature of the men who approached him in China Blue.

I.R.E. 403. Courts have acknowledged that the risk of unfair prejudice by the admission of in-life photographs may be significant. The California Supreme Court has cautioned courts to be careful "in the guilt phase about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims." *California v. Harris*, 118 P.3d 545, 561 (2005) (citations omitted).

However, the district court did not abuse its discretion in finding that the prejudicial effect of the in-life photographs did not substantially outweigh their probative value. *See State v. Russo*, 157 Idaho 299, 309, 336 P.3d 232, 242 (2014) (citing I.R.E. 403). First, the district court recognized that it had discretion in admitting or excluding the photographs. The district court indicated that it had considered defense counsel's argument about unfair prejudice, but reasoned that it thought "those two photographs won't create any undue prejudice." While the district court's reasoning is minimal, it is sufficient. The district court identified that a critical component of the I.R.E. 403 analysis is the danger of undue prejudice, and ruled accordingly. The district court's ruling was well within the boundaries of its discretion and consistent with the legal standards applicable to its decision. Consequently, the district court did not abuse its discretion in admitting the photographs.

2. <u>The district court erred in overruling Garcia's relevance objections to certain challenged portions of Nylander's testimony about Daviel.</u>

As a preliminary matter, the State concedes that Nylander's testimony that she and Daviel were trying to have children was irrelevant and should not have been allowed. As a result, we review this testimony to determine if it was harmless.

In addition, we review the portions of Nylander's testimony about Daviel and what activities they enjoyed together to determine if it should have been excluded because it was irrelevant. This testimony consists of Nylander's following statements:

> **Q.** Okay. Tell us a little bit about Daviel.
> **A.** He was the most amazing person you'll ever meet in your life.[5]
>     . . . .

---

[5] Garcia made several objections during Nylander's testimony when the State asked her about Daviel and what activities the two enjoyed together. After Nylander testified that "[Daviel] was the most amazing person you'll ever meet in your life[,]" Garcia's counsel, Mr. Marx, asked to approach the bench, during which there was a discussion held off the record. It is unclear whether the objection raised at this bench conference was based on relevance, unfair prejudice, or both. Defense counsel renewed his objection once again without additional comment, and then twice more with a comment that he did not "see relevance." No objection based on unfair prejudice was raised until *after* Nylander's testimony was completed. This objection was clearly characterized by the district court and Garcia's counsel below as a motion in limine based on I.R.E. 401 and 403. However, it related only to *prospective* testimony. Accordingly, we review Garcia's objection to Nylander's testimony for harmless error based on relevance.

8

**Q.** Go ahead, Ms. Nylander, tell us a little bit about Daviel.
**A.** So he was a very kind person, somebody that was always willing to help people at all times.

He was – he worked – he did welding for a while and then after that he was an HVAC technician. He was very, very hard working. He worked probably 60 hours a week. He took care of me like no one ever did.[6]

. . . .

**Q.** What are some things that you enjoyed doing with Daviel in just a few sentences?[7]
**A.** We would go on hikes together and we would go to the gym together pretty consistently.

Garcia's contemporaneous objections to this testimony were based solely on relevance.

The grounds for the district court's overruling of Garcia's first objection were given off the record. However, the district court's proffered reasoning in overruling Garcia's motion in limine indicates that the district court still presumed that Nylander's testimony about Daviel was relevant to establishing he was a human being:

> [T]he State is entitled to admit a certain amount of evidence that demonstrates that the victim in this case was a human being and it's an element of the proof. And other than simply acknowledging that is true organically, I think that they're entitled to demonstrate some evidence of his humanness.

Nylander's testimony about what she and Daviel enjoyed doing together, while only minimally relevant, is nevertheless admissible as background information about the victim. Generic information about a victim may be relevant to establishing that a victim is more than a nameless, faceless statistic. *See, e.g.*, *Doneghy v. Kentucky*, 410 S.W.3d 95, 110 (2013) (quotation omitted). We therefore find no error in the district court's ruling that some of this testimony was relevant.

However, some of Nylander's testimony about Daviel went beyond relevant background information. Nylander's testimony that Daviel was "the most amazing person you'll ever meet[,]" "a very kind person," and "somebody that was always willing to help people at all times" was not relevant to establishing Daviel's status as a human being. Nylander's statement that Daviel "took care of [her] like no one ever did" also was not relevant for this purpose. Instead, this testimony only served to glorify or enlarge Daviel in the eyes of the jury. *See Richmond v. Kentucky*, 534 S.W.3d 228, 233 (2017) (citations and quotations omitted). A human

---

[6] After this testimony was elicited, Mr. Marx stated: "Judge, at this point I'd renew the objection I just made." The objection was overruled.
[7] After this question Mr. Marx stated: "Objection, Your Honor, relevance." This objection was also overruled.

being may or may not be a kind person, help others, or take care of his spouse. Accordingly, the district court's ruling that this testimony was relevant was in error.

The State contends for the first time on appeal that there are alternate ways this testimony was relevant. Namely, the State argues that this testimony was relevant to Daviel's physical stature or ability, or Daviel's "character trait for peacefulness or a similar trait." However, these grounds for finding Nylander's testimony relevant were not articulated either by the State below or the district court in overruling Garcia's objections. Although we review a district court's ruling on relevance *de novo*, "[i]ssues not raised below will not be considered by this court on appeal, and the parties will be held to the theory upon which the case was presented to the lower court." *State v. Cohagan*, 162 Idaho 717, 721, 404 P.3d 659, 663 (2017) (alteration in original) (quoting *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017)). Accordingly, we conclude the district court's ruling that this testimony was relevant was in error.

3. The admission of Nylander's testimony constituted harmless error.

The portions of Nylander's testimony that Garcia objected to on relevance were admitted in error by the district court. The State argues that admission of this testimony was harmless because the reference was fleeting and had no bearing on any contested issue. The State further argues the evidence supporting Garcia's guilt was overwhelming. In response, Garcia argues that the "overwhelming evidence" language used by the State is an inaccurate harmless error standard.

We have often stated that "[a] defendant appealing from an objected-to, non-constitutionally-based error shall have the duty to establish that such an error occurred, at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017) (quoting *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010)). However, we recognize confusion exists with respect to our articulation of the "harmless error" standard, and take this opportunity to clarify what constitutes "harmless error."

The "harmless error" standard in Idaho has been predicated on several United States Supreme Court cases, the first of which is *Chapman v. California*, 386 U.S. 18 (1967). As we observed in *Perry*, the U.S. Supreme Court in *Chapman* reviewed California's harmless error standard, and rejected California's "over-reliance on the 'overwhelming evidence' standard."

10

*Perry*, 150 Idaho at 223, 245 P.3d at 975 (citing *Chapman*, 386 U.S. at 23).[8] The United States Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The United States Supreme Court also indicated that there was "little, if any difference between" the inquiry "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963)).

In 1991, the United States Supreme Court further clarified the proper inquiry to determine the circumstances under which "an error did not 'contribute' to the ensuing verdict[.]" *Yates v. Evatt*, 500 U.S. 391, 403 (1991). "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* The *Yates* Court identified "two quite distinct steps. First, [a reviewing court] must ask what evidence the jury actually considered in reaching its verdict." *Id.* at 404. Second, the court must "weigh the probative force of that evidence as against the probative force of the [error] standing alone." *Id.* Accordingly, *Yates* modifies *Chapman's* harmless error standard.[9]

In 1993, the United States Supreme Court articulated the harmless error test in discussing a constitutionally deficient reasonable-doubt jury instruction. *Sullivan*, 508 U.S. at 281. The test, reiterated by the *Sullivan* Court, was "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* at 279 (italics in original). However, the *Sullivan*

---

[8] We recognize that *Chapman v. California* articulates the harmless error standard for *constitutionally* based errors. *See Chapman*, 386 U.S. at 23. Federal courts apply a different harmless error standard for non-constitutional errors. *See*, *e.g.*, *United States v. Gray*, 780 F.3d 458, 469 (1st Cir. 2015) (citing *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946)) (requiring that the reviewing court determine "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.") However, in *Perry*, this Court expanded *Chapman's* application to non-constitutional errors accompanied by contemporaneous objections. *Perry*, 150 Idaho at 227–28, 245 P.3d at 979–80.

[9] We recognize that in *Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991), the United States Supreme Court disapproved *Yates'* articulation of the standard of review for the application of the harmless error test as it applies to *jury instructions*. However, as we recognized in *State v. Perry*, and as clarified by the United States Supreme Court since *Yates*, there is a specific exception to the harmless error standard for jury instructions. *See, e.g., Sullivan v. Louisiana*, 508 U.S. 275, 283 (1993) (Rehnquist, C.J., concurring); *see also Perry*, 150 Idaho at 223, 245 P.3d at 975. Accordingly, *Yates* remains valid precedent for the articulation of the harmless error standard applicable to errors not involving jury instructions. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 9–10 (1999) (citing *Yates*, 500 U.S. at 404); *Sullivan*, 508 U.S. at 279–80 (same).

11

Court went on to hold that an erroneous reasonable-doubt jury instruction was the kind of *structural* error that demanded remand without application of the harmless error test. *Id.* at 282.

In *State v. Perry*, 150 Idaho at 227–28, 245 P.3d at 979–80, we reviewed and summarized the harmless error and fundamental error standards. We recognized that certain errors in jury instructions were structural errors, while others were not. *Id.* at 223, 245 P.3d at 975 (citing *Sullivan*, 508 U.S. at 279; *Neder*, 527 U.S. at 1). We also recognized the *Chapman* standard as giving to the State "the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *Perry*, 150 Idaho at 227, 245 P.3d at 979. However, years later in *State v. Almaraz*, 154 Idaho 584, 301 P.3d 242 (2013), we cited *Perry* for the proposition that an "error is harmless if the Court finds that the result would be the same without the error." *Almaraz*, 154 Idaho at 598, 301 P.3d at 256 (citing *Perry*, 150 Idaho at 227–28, 245 P.3d at 979–80).

Today we take the opportunity to clarify several apparent points of confusion. First, we reiterate that the proper showing for "harmless error" is *not* "overwhelming evidence" of the defendant's guilt. *Chapman v. California* makes clear this is not the correct standard. *See Chapman*, 386 U.S. at 23. Harmless error is "error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates*, 500 U.S. at 403. Proper application of the *Yates* two-part test requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Id.* at 404. When the effect of the error is minimal compared to the probative force of the record establishing guilt "beyond a reasonable doubt" without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless. *Id.* at 404–05. While a reviewing court might quantify the probative force of the record as a whole as "overwhelming evidence" of guilt, as we did in *State v. Montgomery*, 163 Idaho at 46, 408 P.3d at 44, the probative force of the *error* must be weighed as well. To rely on the "overwhelming evidence" standard is to commit the same mistake the United States Supreme Court overturned in *Chapman v. California*, 386 U.S. at 24.

Second, *Sullivan* does not modify the test set out in *Chapman*. *Sullivan* articulates a different approach when the case involves erroneous *jury instructions*. The *Sullivan* Court observed that there was no jury verdict determining Sullivan's guilt because the jury in *Sullivan* had been given an incorrect jury instruction regarding reasonable doubt. *Sullivan*, 508 U.S. at

281. *Sullivan* rephrased the *Chapman* test, under the facts of *Sullivan*, as the question of "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* at 279 (italics in original). The *Sullivan* Court concluded that there was no legitimate guilty verdict to subject to the harmless error test, rendering application of the harmless error test illogical. *Id.* at 280. The *Sullivan* Court's restatement of the harmless error test for the facts of that specific case is limited to cases in which the jury instructions are faulty. Consequently, *Sullivan* did not modify the test set out in *Chapman*. *Accord State v. Joslin*, 166 Idaho 191, 194, 457 P.3d 172, 175 (Ct. App. 2019).

Finally, the language from *Almaraz* paraphrases the *Chapman* test, as set out in *Perry*, 150 Idaho at 227–28, 245 P.3d at 979–80. In *Almaraz*, we articulated the harmless error test, and then stated, "[i]n other words, the error is harmless if the Court finds that the result would be the same without the error." *Almaraz*, 154 Idaho at 598, 301 P.3d at 256 (citing *Perry*, 150 Idaho at 227–28, 245 P.3d at 979–80). This language has been cited several times by this Court and by the Court of Appeals. However, it should also be read in light of *Yates*. The proper application of the *Yates* two-part test may yield a conclusion that the "result would be the same without the error[;]" however, both parts of the *Yates* test need to be analyzed. The probative force of evidence untainted by error against a defendant must be examined and weighed as against the probative force of the error itself. *See Yates*, 500 U.S. at 404–05.

Here, when the error of admitting the challenged portions of Nylander's testimony is weighed against everything else the jury considered, as revealed in the record, the district court's error was harmless. *See Yates*, 500 U.S. at 404–05. The fact that Nylander and Daviel were trying to have children was irrelevant and certainly could invite the jury to improperly consider the impact of the murder on the victim's family during the guilt stage of the proceedings. In addition, the district court admitted evidence about Daviel's character that should not have been admitted. Other portions of Nylander's testimony cast the victim in a sympathetic light; her testimony that Daviel was "the most amazing person you'll ever meet[,]" "a very kind person," and "somebody that was always willing to help people at all times" should have been excluded. However, the jury was presented with significant and substantial evidence about the manner in which Daviel lost his life and Garcia's actions on that night, which weigh heavily against the force of the erroneously admitted testimony.

13

Garcia testified about the events of the evening. He admitted to using methamphetamine, that he had elbow-checked a stranger on the way to the China Blue bathroom, that he was carrying a knife that night, and that he stabbed both Daviel and Rosales with it. Other State witnesses, including several of Garcia's friends that evening, provided testimony that Garcia was "looking for a fight"; and acting "rowdy," "angry[,]" "[w]ild," and "stupid." There was testimony that Garcia had already brandished his knife at another bar, but was told to calm down by one of his friends. After stabbing Daviel and Rosales, Garcia tried to dispose of his knife and attempted to flee China Blue. The probative force of this evidence about Garcia's conduct that evening weighs heavily against the force of the erroneously admitted testimony about the victim. Accordingly, the State has met its burden of establishing beyond a reasonable doubt that the challenged portions of Nylander's testimony did not contribute to the guilty verdict.

## B. The prosecutor did not commit reversible misconduct during closing arguments.

> [W]hen an objection to alleged prosecutorial misconduct is raised at trial, we use a two-part test to determine whether the misconduct requires reversal. First, we ask whether the prosecutor's challenged action was improper. If it was not, then there was no prosecutorial misconduct. If the conduct was improper, we then consider whether the misconduct "prejudiced the defendant's right to a fair trial or whether it was harmless."

*State v. Severson*, 147 Idaho 694, 716, 215 P.3d 414, 436 (2009) (citations omitted). "Unobjected-to prosecutorial misconduct that arises in closing argument must be so egregious that the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Alwin*, 164 Idaho 160, 169, 426 P.3d 1260, 1269 (2018) (quoting *State v. Lankford*, 162 Idaho 477, 497, 399 P.3d 804, 824 (2017)).

The prosecutor began closing arguments by recapping the evidence presented about Daviel: "You heard about Daviel in this trial. State's Exhibit No. 1, you got to see what he looked like. And in the trial you learned that Daviel was only 21 years old that, [sic] he had a father, Jose, his mother—" At this point defense counsel objected, indicating that this was "going to the passions of the jury." This objection was overruled.

The prosecutor then spoke about Daviel's family and Nylander's testimony:

> That he had three siblings; his older brother Misael, who's two years older than him [sic] and who he was closest to, a sister, Kimberly, and a youngest brother, Brandon.

> You also heard from his wife, Danielle, who [said] they'd been married for one and a half years. You know that Daviel worked as [an] HVAC technician,

14

that he worked very hard, sometimes 60 or more hours a week and you knew that Daviel from the testimony in this trial was a happy person, that he was friendly, that he was often smiling, that he was helping others. You also heard about how he often wore glasses as you'll see in State's Exhibit No. 2. You know that he and his wife had been married for a year and a half, however, they had known each other for much longer than that, in fact, going back to 7th grade and then high school sweethearts.

You'll also know that Daviel was active, that he was – enjoyed doing things with his family, that he enjoyed hiking, running. And that the glasses you see in this photograph are similar to the glasses that he wore, the black rimmed glasses that you see him wearing in the surveillance video.

This portion of the prosecutor's closing argument was not objected to by Garcia.

Given that Garcia contemporaneously objected to the prosecutor's first statement about Daviel's family, that objection was preserved on appeal. Garcia now takes issue with the prosecutor's later reference to the in-life photographs and Nylander's testimony, to which Garcia did not object. Garcia argues that the prosecutor committed misconduct by not reminding the jury of the limited purpose for which the photographs and Nylander's testimony had been admitted, i.e., to show that Daviel was a human being. Without such a reminder, Garcia argues that this evidence was referenced "for the sole purpose of appealing to the emotions, passions, and prejudices of the jury."

The State counters that there is no authority suggesting that it is prosecutorial misconduct to fail to indicate the element of proof to which a certain piece of evidence pertains. The State further argues that the challenged photographs were only referenced one time each, and that the challenged testimony was only referenced briefly, with no mention of the irrelevant information concerning Daviel and Nylander's plans to have children.

When contemporaneously objected to, alleged prosecutorial misconduct is subject to a two-part test, first asking if the prosecutor committed misconduct, and then asking if the error was harmless. *Severson*, 147 Idaho at 716, 215 P.3d at 436 (citations omitted). Again, an error is harmless if the State can meet its "burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *Perry*, 150 Idaho at 227, 245 P.3d at 979 (citing *Chapman*, 386 U.S. at 24).

When not objected to, alleged prosecutorial misconduct is subject to the fundamental error test; "[w]hether such comments constitute fundamental error, however, must be considered in the context of the entire trial." *Severson*, 147 Idaho at 720, 215 P.3d at 440 (citation omitted).

15

[I]n cases of unobjected to fundamental error: (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Perry*, 150 Idaho at 226, 245 P.3d at 978 (footnote omitted). In the context of alleged prosecutorial misconduct, the first step of the fundamental error test is to ask whether the alleged misconduct "result[ed] in an unfair trial or deprive[d] the defendant of due process." *State v. Miller*, 165 Idaho 115, 123, 443 P.3d 129, 137 (2019) (citing *Severson*, 147 Idaho at 719, 215 P.3d at 439). "[I]n reviewing allegations of prosecutorial misconduct the Court must keep in mind the realities of trial. A fair trial is not necessarily a perfect trial." *Id.* (quoting *Lankford*, 162 Idaho at 494, 399 P.3d at 821).

This Court has recognized that

[g]enerally, both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom. *State v. Sharp*, 101 Idaho 498, 504, 616 P.2d 1034, 1040 (1980). It is improper, however, for counsel to use inflammatory words to describe a witness or the defendant during closing arguments. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007)[.]

*Severson*, 147 Idaho at 720, 215 P.3d at 440. "Inflammatory comments are comments which are 'calculated to inflame the minds of jurors and arouse passion or prejudice against the defendant, or [are] so inflammatory that the jurors may be influenced to determine guilt on factors outside the evidence.'" *Miller*, 165 Idaho at 123, 443 P.3d at 137 (alteration in original) (quoting *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003)). It is also improper for a prosecutor to argue that substantive evidence admitted for limited evidentiary purposes is, in fact, substantive evidence. *See State v. Hairston*, 133 Idaho 496, 507–08, 988 P.2d 1170, 1181–82 (1999). "[A] prosecutor may not comment on the victim's family during closing argument in order to appeal to the sympathies of the jury. . . . Such extraneous statements are considered improper because their only purpose is to encourage the jury to identify with the victim." *Severson*, 147 Idaho at 720, 215 P.3d at 440 (citations omitted).

In this case, the prosecutor's objected-to reference to Daviel's family was not improper. The prosecutor began her closing argument by revisiting background information about Daviel, which included reference to his family. At the time Garcia objected, the only information the

16

jury had heard was that Daviel "had a loving family, that he grew up in Nampa," and that Daviel had a father and mother. Further, a number of Daviel's family members testified as witnesses. In *Severson*, we stated that a prosecutor "may not comment on the victim's family during closing argument in order to appeal to the sympathies of the jury." *Id.* This does not mean that a prosecutor commits misconduct when references to a victim's family are made as an introduction to closing arguments; it means that these references may not be made *in order to* appeal to the sympathies of the jury. We do not view the prosecutor's brief reference to Daviel's family to be designed to appeal to the sympathies of the jury because at the time of Garcia's objection, the reference to Daviel's family was so minimal and generic that it cannot be considered designed to appeal to the sympathies of the jury. Accordingly, we do not find that the prosecutor committed misconduct in her objected-to reference to Daviel's family.

As for the remaining errors Garcia now alleges on appeal, Garcia's attorney did not renew his objection to the rest of the prosecutor's argument about Daviel's family. Nor did Garcia's attorney contemporaneously object to the prosecutor's references to the length of Daviel's marriage to Nylander, or any reference to the in-life photographs. Accordingly, his challenge on appeal is subject to a fundamental error inquiry. *See Perry*, 150 Idaho at 226, 245 P.3d at 978. Garcia must first establish that one or more of his unwaived constitutional rights were violated. *Id.*

We do not construe the prosecutor's references to the in-life photographs to constitute prosecutorial misconduct. Garcia has argued that the in-life photographs were "only admitted for the purposes of showing [Daviel's] 'humanness,' specifically to prove he was [a] human being." However, the district court's overruling of Garcia's earlier objections to this challenged evidence did not indicate that the evidence was *only* being admitted for those purposes—i.e., that this evidence was limited-purpose evidence. *See also* I.R.E. 105 ("If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."); *Hairston*, 133 Idaho at 507–08, 988 P.2d at 1181–82. In fact, in discussing jury instructions, the district court specifically asked if there was any evidence that had been admitted for a limited purpose, and only one demonstrative piece of evidence was put forth as being admitted for a limited purpose. Ultimately, the photographs served several proper purposes, including establishing for the jury Daviel's stature and physical ability, and assisting

17

the jury in identifying Daviel on the security video. As a result, the prosecutor did not commit misconduct by not reiterating the purpose for which the photographs had been admitted.

We recognize that the prosecutor's other, not-objected-to statements about Daviel's family, how long Daviel and Nylander had known each other, and the length of their marriage could have the effect of appealing to the sympathies of the jury. *See Severson*, 147 Idaho at 720, 215 P.3d at 440. Although the State argues that "a prosecutor does not commit misconduct . . . by discussing evidence admitted at trial and identifying the source of that evidence," these references *together* arguably appealed to the sympathies of the jury, painting the victim in a sympathetic light. *Id.*

However improper the prosecutor's references were to Daviel's family and marriage, these references do not rise to the level of fundamental error suggesting that Garcia was denied due process. *See id.* The statements "were not dwelled upon or made in support of an argument that [Garcia] receive a harsher punishment. Instead, the statements merely reiterated evidence that had been produced at trial." *See id.* Further, the jury was instructed that the prosecutor's closing argument was not to be regarded as evidence. *See id.* Accordingly, Garcia was not deprived of his right to due process by the prosecutor's statements about the victim's family and marriage, and has not established that his constitutional rights were violated. Garcia is not entitled to a perfect trial; he is entitled to a fair trial, which he received. *See Miller*, 165 Idaho at 123, 443 P.3d at 137 (quoting *Lankford*, 162 Idaho at 494, 399 P.3d at 821).

Garcia has not established that the alleged prosecutorial misconduct he objected to was in fact misconduct. He also has not established that the alleged prosecutorial misconduct he did not object to constituted fundamental error. Accordingly, we do not find reversible prosecutorial misconduct in Garcia's case.

## C. There is no cumulative error.

Garcia has argued that even if the errors he has identified individually do not merit disturbing the conviction, when combined they amount to cumulative error. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *State v. Johnson*, 163 Idaho 412, 428, 414 P.3d 234, 250 (2018) (quoting *Perry*, 150 Idaho at 230, 245 P.3d at 982). "The presence of errors, however, does not by itself require the reversal of a conviction, since under due process a defendant is entitled to a fair trial, not an error-free trial." *Id.* (quoting *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174,

18

183 (1998)). "[A]lleged errors at trial[ ] that are not followed by a contemporaneous objection[ ] will not be considered under the cumulative error doctrine unless said errors are found to pass the threshold analysis under our fundamental error doctrine." *Perry*, 150 Idaho at 230, 245 P.3d at 982.

We have identified three errors committed below: an objected-to error about the relevance of Nylander's testimony about Daviel's character, an objected-to error about the relevance of Nylander's testimony that she and Daviel were trying to have children, and an unobjected-to error in the improper statements about the victim's family during closing arguments. Garcia did not contemporaneously object to the last error, which means this error will not be considered under the cumulative error doctrine unless it meets the threshold analysis of fundamental error. *Id.* As discussed above, this last error did not meet the threshold requirement of showing a violation of Garcia's unwaived constitutional rights. *See id.* Accordingly, the errors subject to a cumulative error analysis are the first two objected-to errors to Nylander's testimony based on relevance.

Here, the district court erred in allowing these two portions of testimony because they were not relevant. We recognize the potential of this testimony to inject passion or emotion into the trial and the jury's consideration of the evidence. However, the aggregate effect of these errors, in light of the substantial evidence properly presented at trial, is not of such magnitude that Garcia was denied a fair trial. *State v. Jeske*, 164 Idaho 862, 874, 436 P.3d 683, 695 (2019) (citation omitted). Accordingly, the cumulative error doctrine does not require reversal of Garcia's conviction.

**D. The district court did not abuse its discretion in sentencing Garcia because it considered the appropriate factors and sentenced within the statutory range.**

The district court sentenced Garcia to life in prison with twenty-five years fixed for the second-degree murder charge, which included the deadly weapon sentencing enhancement. The district court also sentenced Garcia to twenty years in prison with six years fixed for the aggravated battery charge, which included the deadly weapon sentencing enhancement. The district court further sentenced Garcia to three years fixed in prison for the possession of methamphetamine charge.

On appeal, Garcia argues that his unified sentences are excessive because the district court "failed to give proper consideration to his admitted substance abuse problem and need for treatment." Garcia argues that "substance abuse and a desire for treatment should be considered

19

as a mitigating factor by the district court when that court imposes [a] sentence[,]" citing *State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982). Garcia also points to certain factors—his mental illness,[10] the showing of support of family and friends, and his remorse—that should have been considered in the district court's determination of the appropriate sentence.

The State argues in response that the district court imposed a reasonable sentence because the sentences were fixed within the statutory limits and were reasonable given the appropriate factors. Further, the State points out that the district court addressed Garcia's (1) substance abuse problems, (2) history of mental illness, and (3) showing of support from family and friends with the sentence it imposed.

In reviewing a sentence imposed by a trial court, this Court reviews "all the facts and circumstances in the case and focus[es] on whether the trial court abused its discretion in fixing the sentence." *Bodenbach*, 165 Idaho at 591, 448 P.3d at 1019 (alteration in original) (quoting *State v. Baker*, 136 Idaho 576, 577, 38 P.3d 614, 615 (2001)). "Where the sentence imposed by a trial court is within statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion." *Id.* (quoting *State v. Miller*, 151 Idaho 828, 834, 264 P.3d 935, 941 (2011)). In determining whether a trial court has abused its discretion, this Court asks whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Id.* (quoting *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194).

> "When appealing a sentence as an abuse of discretion, the appellant 'must establish that, under any reasonable view of the facts, the sentence was excessive considering the objectives of criminal punishment.'" *State v. Matthews*, 164 Idaho 605, 608, 434 P.3d 209, 212 (2019) [(citation omitted)]. "Those objectives are (1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrong-doing." *Id.*

*Bodenbach*, 165 Idaho at 591, 448 P.3d at 1019.

Further, a sentencing court's decision to treat a sentencing factor as mitigating or aggravating "is a factual one." *Id.* at 592, 448 P.3d at 1020 (quoting *State v. Porter*, 130 Idaho 772, 789, 948 P.2d 127, 144 (1997)). Accordingly, this Court will not set aside the

---

[10] In 2010, Garcia was diagnosed with Major Depressive Disorder and Adjustment Disorder with mixed disturbance of emotion and conduct. At that time, he reported a history of cutting and suicide attempts. He was also previously prescribed Zoloft.

"consideration of a factor as aggravating or mitigating" unless this determination is clearly erroneous. *Id.* This Court has further acknowledged that mental illness and substance abuse can be mitigating, or aggravating, or both. *See id.* ("Addiction, by itself, can be either or both a mitigating factor and aggravating factor at sentencing."); *see also Pizzuto v. State*, 146 Idaho 720, 726, 202 P.3d 642, 648 (2008) (explaining low intelligence is a "two-edged" sword, relevant to both aggravation and mitigation).

Here, the district court did not abuse its discretion in fashioning Garcia's sentence. The district court acknowledged that it had discretion in imposing a sentence, and identified the factors that should guide its discretion. *See* I.C. § 19-2521. The district court understood the statutory range of sentences available for Garcia's crimes. Each sentence imposed was within the statutory range.

Further, the district court discussed at length the objectives of criminal punishment, acknowledging the support Garcia enjoyed from family and friends, Garcia's purported remorse, and his intentional pursuit of methamphetamine. The district court pointed out that Garcia's remorse and the outpouring of family and friend support clashed dramatically with the incident reports from Garcia's time in jail and his communications with family and friends. As for considering Garcia's mental health history, earlier in the sentencing hearing, the district court stated it had read the pre-sentence investigation (PSI) reports (one from a 2010 aggravated assault conviction in addition to the PSI in this case), both of which had discussed Garcia's mental health. The district court also asked the State and defense counsel if "there should be additional investigation or evaluation of the defendant" before sentencing proceeded.

> MR. HAWS (State's counsel): I don't—it would be helpful, I think, for the Court to have a mental health evaluation, but I know the defendant has the right to not participate in that.
>
> THE COURT: Mr. Marx (defense counsel), I gather from Mr. Garcia's previous responses that he would not be participating in a mental health evaluation?
>
> MR. MARX: Correct, Your Honor. Those issues can be addressed through argument, but we would not ask for a reset for any other evaluations.

Accordingly, the district court considered Garcia's mental health, albeit in the context of Garcia's apparent refusal to participate in a mental health evaluation.

Essentially, Garcia appears to ask this Court to "reweigh the district court's factual findings or that the district court mistook certain facts as aggravating, rather than mitigating."

21

*Bodenbach*, 165 Idaho at 592, 448 P.3d at 1020. The district court's decision to treat Garcia's history of mental illness as an aggravating factor, and not to treat his purported remorse or the support from friends and family as a mitigating factor, was reached after weighing all of the evidence and is not clearly erroneous. *See id.* Accordingly, the district court did not abuse its discretion, and the judgment of conviction and order of commitment is affirmed.

**E. The district court abused its discretion in entering an order of restitution without properly considering Garcia's ability to repay the amount in the future.**

The district court entered an order of restitution against Garcia, requiring him to pay $162,285.27. This order was entered pursuant to Idaho Code section 19-5304(7) as restitution to the victims of Garcia's crimes. According to the district court's order on restitution, the amount consisted of $35,116.08 to Rosales, the Crime Victims Compensation Program, and the Drug Enforcement Donation Account; $15,934.27 to St. Alphonsus Regional Medical Center; $104,281.72 to Blue Cross of Idaho; $213.60 to Gem State Radiology; $1,874.60 to St. Alphonsus Medical Group; $2,865.00 to Boise Anesthesia PA; and $2,000.00 to the Idaho State Crime Lab and the Boise Police Department for DNA Bode Cellmark Lab.[11]

On appeal, Garcia argues that the district court abused its discretion by "fail[ing] to adequately consider his inability to pay restitution." Garcia supports this argument by asserting that he does not have the education or assurance of employment to pay the restitution amount when he is released in no sooner than twenty-five years.[12]

The State responds by pointing to Idaho Code section 19-5304(7), which states, "[t]he immediate inability to pay restitution by a defendant shall not be, in and of itself, a reason to not order restitution." The State also cites several Court of Appeals and Supreme Court cases for the proposition that the inability to pay "neither precludes nor limits a restitution award[.]" (citing *State v. Taie*, 138 Idaho 878, 880, 71 P.3d 477, 479 (2003); *State v. Olpin*, 140 Idaho 377, 379, 93 P.3d 708, 710 (Ct. App. 2004); *State v. Bybee*, 115 Idaho 541, 543, 768 P.2d 804, 806 (Ct. App. 1989)).

This Court reviews a district court's order of restitution for abuse of discretion, examining whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted

---

[11] The district court found that it was statutorily limited by Idaho Code section 19-5506(7) for restitution for DNA testing. Accordingly, even though the Idaho State Crime Lab and DNA Bode Cellmark Lab costs were in excess of $2,000, the district court only ordered $2,000.

[12] Because of the sentences imposed, Garcia will be required to serve a minimum of twenty-five years in the penitentiary before he will even be eligible for parole.

within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Bodenbach*, 165 Idaho at 591, 448 P.3d at 1019 (quoting *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194). "[W]hether to order restitution, and in what amount, is within the district court's discretion and is guided by consideration of the factors set forth in Idaho Code section 19-5304(7)." *State v. Wisdom*, 161 Idaho 916, 919, 393 P.3d 576, 579 (2017) (alteration in original) (quoting *State v. Corbus*, 150 Idaho 599, 602, 249 P.3d 398, 401 (2011)). These factors include "the amount of economic loss sustained by the victim as a result of the offense, the financial resources, needs and earning ability of the defendant, and such other factors as the court deems appropriate." I.C. § 19-5304(7). "The immediate inability to pay restitution by a defendant shall not be, in and of itself, a reason to not order restitution." *Id.* "[A] court may order restitution based on a foreseeable ability to repay the award." *Wisdom*, 161 Idaho at 924, 393 P.3d at 584. A district court's determination that a defendant has a foreseeable ability to repay the award is a factual finding that will not be disturbed on appeal if supported by substantial evidence. *See id.* (citing *Corbus*, 150 Idaho at 602, 249 P.3d at 401).

Several decisions from the Court of Appeals and this Court are instructive in understanding a defendant's ability to pay. In *Bybee*, 115 Idaho at 542, 768 P.2d at 805, the Court of Appeals examined an order of restitution of $1,628,738 against an appellant convicted of grand theft of precious metals. Bybee had used the value of precious metals owned by clients of his investment service to meet margin calls for speculative trading, ultimately losing all of his clients' invested assets. *Id.* He was given an indeterminate fourteen-year sentence. *Id.* at 543, 768 P.2d at 806. The district court recognized that Bybee "has no present earning capacity or ability to pay[,]" but also "noted that Bybee has the business acumen to earn money for restitution upon his eventual release from prison." *Id.* In affirming the district court, the Court of Appeals stated:

> If the order required Bybee to make installment payments or if it had set a deadline for paying restitution, we would be inclined to vacate the order. As it now stands, however, the order simply gives the victims the present ability to obtain a judgment. We see nothing wrong with that.

*Id.*

In *Wisdom*, 161 Idaho at 918, 393 P.3d at 578, this Court was asked to find that a district court had abused its discretion in entering an order for restitution of $11,069.82 against Wisdom because of her purported inability to repay the amount stolen. The district court had made the

restitution payments a condition of her probation. *Id.* at 924–25, 393 P.3d at 584–85. This Court observed that "[t]he immediate inability to pay restitution" was not an inherent "reason to not order restitution" under Idaho Code section 19-5304(7). *Id.* at 924, 393 P.3d at 584. Nevertheless, this Court noted that "a court may order restitution based on a *foreseeable ability* to repay the award." *Id.* (italics added). Because the district court found that Wisdom had a foreseeable ability to pay the award in the future, and this was supported by substantial evidence in the record—especially because Wisdom was only on probation, had secured minimum-wage employment, and likely could be promoted and enjoy an increase in her earnings—this Court affirmed the order of restitution. *Id.* at 924–25, 393 P.3d at 584–85.

Here, we conclude that the district court abused its discretion in entering the order of restitution against Garcia in the amount of $162,285.27. The district court correctly acknowledged the proper factors to consider in crafting an order of restitution. The district court also correctly identified that "[t]he immediate inability to pay restitution by a defendant shall not be, in and of itself, a reason to not order restitution." (quoting I.C. § 19-5304(7)). However, the district court did not recognize that the "immediate inability" of a defendant to pay is a separate concept from the "foreseeable ability" of the defendant to repay the award. *See Wisdom*, 161 Idaho at 924, 393 P.3d at 584. Accordingly, the district court abused its discretion by failing to recognize the outer boundaries of its discretion in failing to identify the proper standard. *See, e.g.*, *Crowley v. Critchfield*, 145 Idaho 509, 513, 181 P.3d 435, 439 (2007) (finding no abuse of discretion when district court correctly stated and applied the applicable legal standard).

Further, the district court abused its discretion by not showing an exercise of reason. The district court's analysis with respect to Garcia's ability to pay consists of one sentence: "Having considered [Garcia's] economic circumstances, the Court concludes that an order of restitution is appropriate in this case." The Court of Appeals affirmed the district court in *Bybee*, noting that the district court had acknowledged both the magnitude of the restitution and Bybee's business acumen. *See Bybee*, 115 Idaho at 543, 768 P.2d at 806. This Court observed that the district court in *Wisdom* had specifically found that Wisdom could expect her employment situation to improve; this Court found that "[t]he presentence materials serve[d] as substantial evidence supporting that conclusion." *Wisdom*, 161 Idaho at 924, 393 P.3d at 584. There is no similar analysis provided by the district court here, even though nothing in the presentence materials

serves as "substantial evidence" that Garcia has any foreseeable ability to repay the amount of restitution awarded.

Importantly, nothing in our decision today should suggest that a district court is required to divine a defendant's future financial capabilities, or that a district court should limit a victim's right to restitution to what is presently known about the defendant. A defendant facing a lengthy prison sentence may be dramatically different and markedly more employable *after* his release than he was at the time of his crime. However, the district court did not address Garcia's future ability to repay at all. This is a failure to show an exercise of reason, and therefore constitutes an abuse of discretion. Accordingly, we vacate the restitution award with respect to the amount of restitution to which Garcia did not agree, and we remand for a proper, reasoned consideration of all of the factors identified in Idaho Code section 19-5304(7), including Garcia's future ability to repay.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of conviction. The district court did not abuse its discretion in admitting the in-life photographs of the victim, the district court committed only harmless error in admitting certain portions of testimony from the wife of one of the victims, the prosecutor did not commit reversible misconduct in her closing argument, and there was no cumulative error. Further, we affirm the sentence imposed because the district court did not abuse its discretion when it sentenced Garcia.

The order of restitution is vacated with respect to the amount of restitution to which Garcia did not agree. The case is remanded for the district court to consider Garcia's foreseeable ability to pay restitution at some point in the future when it considers the amount of restitution.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.

25